UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| RUTH SCHEIDT, on her own behalf and on behalf of her son, M.S., as his mother and next friend, <br><br> Plaintiffs, <br><br> v. <br><br> TRI-CREEK SCHOOL CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 2:05-CV-204 |

**UNITED STATES' MEMORANDUM AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Tri-Creek School Corporation's ("Tri-Creek" or the "District") attendance policy violates plaintiffs' right to freely exercise their religion, and Ms. Scheidt's right to raise her son consistent with her religious beliefs. The policy provides that missing more than one school day for religious worship results in an unexcused absence, and subjects the student to various sanctions, including loss of academic credit, inability to make up work, suspension, and legal action against the parent. To adhere to the fundamental commandments of plaintiffs' religion, M.S. must miss more than one school day each year to attend religious services. As a result, last year M.S. received unexcused absences for the days he was attending religious services; teachers failed to allow him to make up classwork; and the District threatened expulsion and legal action, including the filing of educational neglect charges against Ms. Scheidt. M.S. faces the same conflict this academic year. The District's actions deny the fundamental right of the Scheidts to practice their religion, and of Ms. Scheidt to direct the religious education of her son, in violation of the Free Exercise Clause and the Fourteenth Amendment.

**STATEMENT OF INTEREST**

On November 8, 2004, the United States Department of Justice received a written complaint alleging religious discrimination by the District in refusing to excuse absences from school for religious observances. In response, the United States commenced an investigation into the allegations. See 42 U.S.C. §§ 2000c-6, 2000h-2 (authorizing the United States to sue or intervene in suits alleging denial of equal protection of laws by public schools on the basis of, inter alia, religion).

In the interim, this private suit was filed to enjoin Tri-Creek's continued enforcement of the policy in question. Given the statutory mandate to prevent discrimination on the basis of religion, the United States has a strong interest in ensuring that students of all religious faiths, or none at all, are permitted to participate in the full educational program offered by public schools. See, e.g., Hearn v. Muskogee Pub. Sch. Dist. 020, C.A. No. CIV 03-598-S (E.D. Okla. 2004) (permitting United States to intervene where Muslim student was barred from wearing a headscarf to school); Westfield High School L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98, 101 (D. Mass. 2003) (permitting United States to participate as amicus curiae in case where students were suspended for distributing candy canes with religious messages attached). This case implicates that interest for, as set forth below, Tri-Creek has adopted a school attendance policy that permits excused absences for a wide array of reasons and for any number of days, yet limits excused absences for religious observances to a single school day.

Finally, while the complaint does not raise a separate Equal Protection Clause claim, due to the substantial overlap between the Free Exercise and Equal Protection Clauses in cases involving discrimination against religion, the United States has a strong interest in the outcome

of this case. See, e.g, Johnson v. Robinson, 415 U.S. 361, 375 n.14 (1974) (holding that under "fundamental rights" analysis of Equal Protection Clause, standard is the same as for Free Exercise Clause); Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 715 (O'Connor, J., concurring) ("the Free Exercise Clause, the Establishment Clause . . . and the Equal Protection Clause as applied to religion – all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits").

## STATEMENT OF FACTS

Tri-Creek prescribes the maximum number of school days a student may miss: "[f]ive days of excused absence or two days of unexcused absence per semester." Student & Parent Handbook, at 6 (attached hereto as Exhibit "1"). Surpassing either threshold triggers Tri-Creek's "excessive absenteeism" policy and subjects the student to a number of sanctions, including loss of academic credit; detention; suspension; contacting legal authorities; serving parents with legal notice; and filing of educational neglect charges. Id. at 6-7. Moreover, the policy provides that students in grades K-8 who have just one unexcused absence may be subject to the following disciplinary actions: loss of recesses; assignment to work detail; conferences with parents; disciplinary contract; denial of participation in extracurricular activities and field trips; and suspension or expulsion. Id. at 8-9.

Excused absences under the policy are permitted for a wide variety of reasons: personal illness, death in the immediate family, quarantine, court appearances, "attendance at State Fair on Education Day," "service as [a] page at State Legislature," and, at the principal's discretion, in cases of "emergencies" and "other absences approved in advance." Id. 7, 9; "Student Personnel,

3

Attendance Procedures and Student Conduct," 1976 (origination date) & 1996 (revision date).[1] Moreover, excused absences for personal illness, a family death, quarantine, court appearances, and principal-designated emergencies "will not be counted toward the five-day maximum leading to a designation of excessive absenteeism." Id. at 7. But as to absences for religious reasons, the policy limits excused absences to "attendance at special church services (when arranged in advance and not to exceed one day)." Id. at 7.

During the 2004-05 school year, M.S., an eighth-grade student at Lowell Middle School, was given eight unexcused absences for missing school for religious worship. See Attendance Summary for M.S. (attached hereto as Exhibit "2").[2] Both M.S. and his mother are adherents to the religious tenets of the United Church of God. Fundamental commandments of the United Church of God include worshiping during seven annual Holy Days and the Feast of Tabernacles, which is a seven-day festival held at a predetermined site in the United States. See Clyde Kilough Affidavit at ¶¶ 5-7, 11, 21;[3] Ruth Scheidt Affidavit at ¶¶ 6-8, 14-15. Thus, attendance at the Feast of Tabernacles requires long-distance travel for the majority of United Church of God members, and time off from work and school for all members. See Kilough Aff. at ¶ 20. During

---

[1] The United States requested that Tri-Creek provide policies pertaining to attendance. In response, Tri-Creek asserted that both the handbook and the "Student Personnel, Attendance Procedures and Student Conduct" comprised its attendance policies. Both are attached as Exhibit "1."

[2] M.S.'s attendance summary was provided to the United States by the District. According to the cover letter provided with the summary, "per business" is the code entered after one religious excused absence occurs and is the equivalent of an unexcused absence. See Letter from Monica J. Conrad to Tobi Longwitz (Mar. 14, 2005) (attached hereto as Exhibit "3").

[3] Clyde Kilough is an ordained minister and the president of the United Church of God. Kilough Aff. at ¶ 1.

the 2004-05 school year, Ms. Scheidt and her son observed all of the Holy Days and the Feast of Tabernacles, which was held in Michigan City, Indiana.  Scheidt Aff. at ¶¶ 28-29.  Because some of the Holy Days and parts of the Feast of Tabernacles fell on non-school days, adherence to their religion required that M.S. miss nine school days, see id. at ¶¶ 23, 28, 37, only one of which was excused under Tri-Creek's attendance policy.  See Attendance Summary for M.S., Exh. "2;" Scheidt Aff. at ¶ 38.

Ms. Scheidt notified the District in advance, both orally and in writing, of her and M.S.'s religious obligations.  See Complaint, Exh. 1; Scheidt Aff. at ¶ 23-27.  However, under the District's policy, all but one of M.S.'s absences were recorded as unexcused.  See Attendance Summary for M.S., Exh. "2."  Furthermore, M.S. was forced to sign an "Attendance Contract" which stated that he has had "excessive absenteeism" and noted that "[p]enalties to excessive absenteeism include loss of credit in class and/or possible expulsion from school."  Attendance Contract (attached hereto as Exhibit "4").  Moreover, some of M.S.'s teachers did not permit M.S. to make up the classwork that he missed.  See Progress Reports for M.S. (attached hereto as Exhibit "5").[4]  Finally, M.S.'s principal, John Alessia, informed Ms. Scheidt that educational neglect charges might be filed if M.S. was absent from school to observe his religious holidays.  See Scheidt Aff. at ¶ 25.

For the upcoming school year, which starts on August 18, 2005, approximately ten of the United Church of God's holy days and festivals fall on school days.  See Scheidt Aff. at ¶ 44; United Church of God Calendars (attached to Kilough Aff. at ¶ 8).  Under Tri-Creek's policy,

---

[4] Based on the documents provided by the District and attached hereto as Exhibit "5," it appears that some teachers, including M.S.'s mathematics teacher, may have, in addition to failing to allow M.S. to make up work, also given him zeroes for this missed work.

5

M.S. will receive unexcused absences for all but one, and again be subject to academic sanctions, and Ms. Scheidt will be subject to legal action.

## ARGUMENT

Tri-Creek's attendance policy violates plaintiffs' rights under the First and Fourteenth Amendment to the free exercise of religion and the right to direct the religious upbringing and education of one's children.  This case turns on the applicable level of judicial scrutiny.  While the District may argue that the policy is a neutral, generally applicable rule that is subject to rational basis review, strict scrutiny applies for two reasons.  First, the attendance policy is not a neutral and generally applicable rule.  The District has reserved the right to make case-by-case exceptions to the policy, including attending the State Fair, working as a page for the legislature, and for any reason that a principal deems to be an emergency or otherwise approves, but has specifically stated that it will not make such exceptions for religion.  Moreover, while the District does not limit the number of absences under any of these preferred categories, it caps absences for church attendance at one day.  Second, when a free exercise claim is asserted in conjunction with another constitutionally-protected right, strict scrutiny applies.  Here, the plaintiffs' claims involve free exercise rights coupled with the fundamental right to direct the religious upbringing and education of one's child.

Accordingly, to survive strict scrutiny, the District must show that the policy furthers a compelling interest and is narrowly tailored.  Tri-Creek cannot do so.  The policy's own terms prove the point.  Excused absences exceeding one day are permitted under numerous circumstances.  It is plain from this that absences exceeding one day can be, and in fact are, accommodated.  Thus, there is no compelling interest in limiting religious absences to one day.

Additionally, Tri-Creek has in place a number of procedures to ensure that a student who misses school continues to progress academically. Since these accommodations could easily be extended to include religious absences as well as the other, preferred absences, the policy is not narrowly tailored. Consequently, plaintiffs' preliminary injunction should be granted.[5]

## I.     The District's Attendance Policy Is Subject to Strict Scrutiny.

The First Amendment's Free Exercise Clause, made applicable to the States by incorporation through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Employment Div. v. Smith, 494 U.S. 872, 877 (1990). "But the 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [including] assembling with others for a worship service." Id.

The level of judicial scrutiny applied to a Free Exercise claim depends on the nature of the challenged governmental act. When "prohibiting the exercise of religion . . . is not the object of [a governmental policy] but merely the incidental effect of a generally applicable and otherwise valid provision," the policy need only be rationally related to a legitimate governmental objective to pass constitutional muster. Smith, 494 U.S. at 878-79. But strict scrutiny will apply when the policy (1) provides for individualized exemptions and those exemptions are not afforded to religious practices; or (2) the policy violates constitutional rights

---

[5] The United States' brief addresses only the merits of plaintiffs' claims and not the other requirements for preliminary injunctive relief as they are comprehensively addressed in plaintiffs' filings.

7

in addition to free exercise.  Smith, 494 U.S. at  877-78, 882, 884; Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 540-41 (1993); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 764 (7th Cir. 2003).  Under those circumstances, a defendant must show that the policy in question "advance[s] interests of the highest order" and "is narrowly tailored in pursuit of those interests." Lukumi, 508 U.S. at 546 (citing Smith, 494 U.S. at 888; Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)) .

     A.     The District's Attendance Policy Permits Individualized Exemptions Not Afforded to Religious Worship.

The Supreme Court has held that a policy substantially burdening religious practice is not generally applicable, and thus warrants strict scrutiny, if it "has in place a system of individual exemptions."  Smith, 494 U.S. at 884.  Smith derives this principle from Sherbert v. Verner, 374 U.S. 398 (1963), and later Supreme Court cases applying Sherbert.  See Smith, 494 U.S. at 884.  In Sherbert, the Court held that a State could not constitutionally deny unemployment benefits to a member of the Seventh-day Adventist Church who was discharged from her job as a mill worker and could not find equivalent work because her religious convictions prevented her from working on Saturdays.  Because the statute's distribution of benefits permitted individualized exemptions based on "good cause," the Court explained in Sherbert, the State could not refuse to accept the plaintiff's religious reasons for not working on Saturdays as good cause without violating the Free Exercise Clause, unless the State could show that the denial of the exemption furthered a compelling interest and did so by the least restrictive means available.  374 U.S. at 401, 405-07.  Accordingly, "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of

8

religious hardship without compelling reason." Lukumi, 508 U.S. at 537 (internal quotation marks omitted); see also Smith, 494 U.S. at 884; Civil Liberties for Urban Believers, 342 F.3d at 764.[6]

Here, the District has a system of individualized exemptions, permitting students to receive excused absences for, among other things, "attendance at State Fair on Education Day" and "service as [a] page at State Legislature." "Student Personnel, Attendance Procedures and Student Conduct," Exh. "1." Moreover, the policy vests principals with nearly unfettered discretion to grant individualized exemptions in cases of "emergencies" (noting that baby-sitting and shopping are not considered emergencies) and "other absences approved in advance." Student & Parent Handbook, at 7, 9, Exh. "1." However, while not limiting any other exemptions, the District's attendance policy prohibits exemptions for religious worship in excess of one day, and the District and M.S.'s principal, refuse to alter or grant exemptions to this policy. See Student & Parent Handbook, at 7, 9, Exh. "1;" "Student Personnel, Attendance

---

[6] See also Axson-Flynn v. Johnson, 356 F.3d 1277, 1298-99 (10th Cir. 2004) (holding that because university's drama program permitted absences for religious holidays, there was genuine issue of material fact whether it had maintained a system of individualized exemptions that would trigger strict scrutiny of its denial of student's request for excusal from certain assignments due to her religious objection to profanity); Fraternal Order of Police v. City of Newark, 170 F.3d 359, 364-65 (3d Cir. 1999) (applying heightened scrutiny where police department excused officers from no-beards grooming requirement due to medical skin condition, but refused to extend similar accommodation to officers with religious reasons for wearing beards); Rader v. Johnston, 924 F. Supp. 1540, 1550, 1553 (D. Neb. 1996) (applying strict scrutiny to university rule requiring freshmen to live on campus since rule exempted various categories of students and provided for hardship exemptions but refused to extend exemption for religious hardship). Cf. Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 897 (7th Cir. 2005) (noting that Sherbert's individualized assessment doctrine continues to apply after Smith, and that Congress's codification of that doctrine in the Religious Land Use and Institutionalized Persons Act therefore was an "uncontroversial use" of Congress' power under Section 5 of the Fourteenth Amendment).

Procedures and Student Conduct," Exh. "1;" Attendance Summary for M.S., Exh. "2;" Scheidt Aff. at ¶ 25. In essence, Tri-Creek has created a list of reasons for excused absences in which religious-based ones are disfavored to the benefit of any number of secular-based reasons, including those which a principal, in his or her discretion, approves. This policy is thus not neutral and generally applicable under Sherbert, Smith, and Lukumi, and therefore must survive strict scrutiny before it can be applied in a way that substantially burdens plaintiffs' religious exercise.

### B. Plaintiffs Present a Hybrid Rights Claim.

Strict scrutiny also is warranted when Free Exercise claims are coupled with other constitutionally-protected rights, such as "the Free Exercise Clause in conjunction with . . . the right of parents . . . to direct the education of their children. . . ." Smith, 494 U.S. at 881 (citations omitted). For the proposition that strict scrutiny applied to "hybrid situation[s]," Smith cited the Court's decision in Wisconsin v. Yoder, which held that Amish parents could withdraw their children from school after eighth grade, in contravention of state compulsory education laws, because of their religious beliefs and their right to direct the religious upbringing of their children. Id. at 882. In particular, the Smith Court pointed to a passage in Yoder holding: "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." Smith, 494 U.S. at 882 (quoting Yoder, 406 U.S. at 233).

Claims based on a free exercise right coupled with some other fundamental constitutional interest have been referred to as "hybrid rights" claims. See, e.g., Civil Liberties for Urban

10

Believers, 342 F.3d at 765. In Civil Liberties for Urban Believers, the Seventh Circuit, addressing the standard to be applied in such cases stated: "a plaintiff does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." Civil Liberties for Urban Believers, 342 F.3d at 765 (quoting Miller v. Reed, 176 F.3d 1202, 1207-08 (9th Cir. 1999). The Seventh Circuit also relied on Swanson v. Guthrie Indep. Sch. Dist. No. I-L, which held that strict scrutiny under a hybrid rights approach requires "a colorable showing of infringement of [a companion] constitutional right[], rather than the mere invocation of a general right." Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 700 (10th Cir. 1998); see also Vineyard Christian Fellowship v. City of Evanston, 250 F. Supp. 2d 961, 989 (N.D. Ill. 2003) (holding that to prove a violation in a hybrid free exercise situation, "a plaintiff must make a showing of a colorable infringement of one of the other constitutional rights involved in the hybrid claim"); Hicks v. Halifax County Board of Education, 93 F. Supp. 2d 649, 663 (E.D.N.C. 1999) (holding that there was genuine issue of material fact whether school uniform policy violated constitutional rights of child and guardian who objected on religious grounds, under hybrid rights theory combining free-exercise claim with claim "based on the parental right to direct the religious upbringing and education of children" ).

      This case presents a "hybrid rights" claim because the Scheidts' complaint combines a Free Exercise claim with a clear constitutional violation of the fundamental right to direct M.S.'s religious upbringing and education. As noted above, the Free Exercise Clause requires that individuals not only be able to believe and profess whatever religious doctrine they desire, but also to be able to perform physical acts, including "assembling with others for a worship

11

service." Smith, 494 U.S. at 877.  The United Church of God believes that "its members and their children are commanded by God to observe and attend the festivals and holy days." Kilough Aff. at ¶ 21; Scheidt Aff. at ¶ 15.  Indeed, failure to attend the festivals is "considered a sin and may result in the loss of membership in the church." Church of God (Worldwide, Texas Region) v. Amarillo Ind. Sch. Dist., 511 F. Supp. 613, 614 (N.D. Tex. 1981).  Thus, Tri-Creek's attendance policy (and the actions of its administrators), by threatening legal prosecution of Ms. Scheidt if she obeys a fundamental religious commandment of her faith clearly infringes her right to exercise her religion freely.

The Supreme Court also has recognized a fundamental "liberty of parents and guardians to direct the upbringing and education of children under their control." Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534-35 (1925); see also Meyer v. Nebraska, 262 U.S. 390 (1923).  This case thus implicates the same right that provided the "hybrid situation" in Yoder: "the fundamental interest of parents . . . to guide the religious future and education of their children."  406 U.S. at 232.  In Yoder, the Court recognized the right of Amish parents to remove their children from school after eighth grade to provide them with vocational training in their community with other Amish teenagers and thereby inculcate Amish values.  The Court found that the preservation of separateness from modern society that this practice furthers is a "command [that] is fundamental to the Amish faith." Id. at 216.  Here, Ms. Scheidt seeks to remove M.S. from school for a short period of time to attend Holy Days and a religious festival that is fundamental to their faith.  The District's attendance policy and actions have violated her right to direct the religious upbringing and education of M.S. by denying her the irreplaceable opportunity to guide her son's study and experience of Church doctrine and

12

practice. As in Yoder, the Scheidts here have demonstrated a hybrid situation that triggers strict scrutiny.

## II.     The District's Policy Fails Strict Scrutiny.

Strict scrutiny requires that Tri-Creek's attendance policy be narrowly tailored to further a compelling governmental interest. See Lukumi, 508 U.S. at 546. Plaintiffs clearly articulate the reasons that Tri-Creek's policy does not further a compelling governmental interest and is not narrowly tailored, see Pl. Mem. at 11-16, and the United States only offers the following observations.

First, the state's authority to require school attendance is not absolute. The Supreme Court has held that a parent can withhold her child from school altogether if so dictated by religious belief. See Yoder, 406 U.S. at 234-35. Yoder involved the weighing of the state's interest in enforcing its compulsory school attendance law against Amish parents' refusal, pursuant to fundamental tenets of their faith, to send their children to secondary school. In holding for the parents, the Supreme Court made clear that while the state has a compelling interest in assuring that children attend school, that interest is not absolute and must give way when it clashes with the fundamental tenet of families' rights to direct the religious upbringing of their children. See Yoder, 406 U.S. at 215.

Another federal court, in a case involving the same religious beliefs at issue here, likewise found that a school district violated free exercise rights by enforcing an attendance

13

policy which permitted only two days of excused absences per year for religious holidays. See Church of God (Worldwide, Texas Region) v. Amarillo Ind. Sch. Dist., 511 F. Supp. 613 (N.D. Tex. 1981). There, the court stated:

> The Court does not doubt the sincerity of the school district's interest in the academic development of its students. The state's responsibility for the education of its citizens ranks at the apex of the function of a state. Yet even this paramount responsibility must yield when the application of a law or regulation significantly burdens the free exercise of religion. . . . The school district's interest in this cause does not approach the magnitude of the state's interest in Wisconsin v. Yoder. Here we are not concerned with a religious sect that insists on keeping their children away from school. We are concerned only with the effect of a handful of absences on the Plaintiffs' academic development. This interest, standing alone, does not justify the burden placed on the free exercise of religion.

Id. at 617-18.

Second, the District's own policy undermines any argument that there is any compelling need to withhold excused absences for religious observance. The District contemplates that some students will from time to time be absent for personal reasons including illness, death in the family, work as a page at the state legislature, and so forth. The District's attendance policy also contemplates that there will be other absences for legitimate personal reasons, and thus provides principals the power to grant excused absences. In those circumstances, the school policy contemplates that any missed school work can be made up and that the educational mission of the District will not be undermined in any significant way by the absences. The same is true with religious absences. Indeed, the District informed the United States that some (if not all) of the teachers allowed M.S. to make up work for credit. See Letter from Monica J. Conrad to Tobi Longwitz (Mar. 14, 2005), Exh. "3." While the District certainly has a compelling government interest in educating the children with whom parents have entrusted it, the attendance policy

14

itself demonstrates that there is no compelling government interest in perfect attendance by all students with no allowance for absence for legitimate personal reasons.

Finally, the District's actions against the plaintiffs, including threatening legal action, placing unexcused absences on M.S.'s record, and failing to allow him to make up work, are not the least restrictive means of furthering its educational goals.  See Pl. Mem. at 15-16.  To the contrary, as noted above, the District grants excused absences, permits make-up work, grants students credit, and requires teachers to provide reasonable help when students are granted exemptions from its mandatory attendance policy, whether the absence is due to illness, to attend the State Fair, other listed reasons, or otherwise approved by a principal.  See Student & Parent Handbook, at 6-7, 9, Exh. "1."  Through these means the District preserves its educational goals while making reasonable accommodations for legitimate personal reasons.  There is no reason that such accommodations cannot – and should not – be extended to a student required to be absent from school because of religious observances.

## CONCLUSION

  For the foregoing reasons, the Plaintiffs' request for a preliminary injunction should be granted.

            Respectfully submitted,

| | |
|---|---|
| JOSEPH S. VAN BOKKELEN | BRADLEY J. SCHLOZMAN |
| UNITED STATES ATTORNEY | ACTING ASSISTANT ATTORNEY GENERAL |

| | |
|---|---|
|   /s/ Joseph S. Reid |   /s/ Amy I. Berman |
| JOSEPH S. REID | ERIC W. TREENE |
| Assistant United States Attorney | JAVIER M. GUZMAN |
| United States Attorney's Office | AMY I. BERMAN |
| 5400 Federal Plaza, Suite 1500 | U.S. Department of Justice |
| Hammond, IN 46320 | Civil Rights Division |
| Ph: (219)937-5500 | Educational Opportunities Section-PHB |
| Fax: (219)852-2770 | 950 Pennsylvania Ave., N.W. |
| joseph.reid@usdoj.gov | Washington, DC 20530 |
| | Ph: (202) 514-4092 |
| | Fax: (202) 514-8337 |
| | Attorneys for the United States of America |

Dated: August 10, 2005

CERTIFICATE OF SERVICE

I hereby certify that on 10th day of August , 2005, Joseph S. Reid, electrically filed the foregoing **UNITED STATES' MEMORANDUM AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/CM/ECF system which sent notification of such filing to the following: jacquelyn.bowi-suess@iclu.org, khart@boselaw.com mcconrad@boselaw.com .   And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/CM/ECF participants: N/A

s/ Denise O'Connor-Blanchard<br>Legal Assistant

OFFICE OF:
United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
Tel: (219) 937-5500
Fax:(219) 937-5547